Merrick, PJ.
This is a G.L.c. 140, §155 action to recover for personal injuries and property damage (injury to a dog) caused by a dog called “Pupling,” of which the defendants are the alleged owner and keeper. The dispositive issue raised on this Dist./Mun. Cts. R. A. D. A., Rule 8C, appeal by the defendants is not one common to a “dog bite” case, but is instead the question of whether the trial judge abused his discretion in ordering a judgment against the defendants and plaintiffs-in-counterclaim for deliberate misconduct at trial.
The underlying dispute is uncomplicated. Defendants William Lipp (“Lipp”) and Lisa Nocco (“Nocco”) have no legal relationship, but live together in a house owned by Lipp at 54 Valley Road in Tewksbury, Massachusetts. On September 10, 1998, plaintiffs Nancy Brothers (“Nancy”) and Patrick Brothers (“Patrick”) were walking their two leashed dogs on Valley Road on the opposite side of the street from the defendants’ residence. The dog “Pupling,” described by the plaintiffs as a pit bull or a pit bull “mix” and by Nocco as a “shepherd mix,” emerged from Lipp’s property, came across the narrow road and attacked the plaintiffs’ dog “Ginger.” During the attack, Ginger sustained a serious bite wound which required surgery at a nearby animal hospital, and both Nancy and Patrick were also bitten by Pupling. Patrick Brothers was finally able to pull Pupling off his dog and somehow managed, “straddling” the animal and gripping its collar, to get Pupling back across the road to the defendants’ home. It is undisputed that Nocco opened the door to Patrick and took Pupling inside. The principal factual disputes in the underlying case arose from Lipp’s denial that he was the owner or keeper of the dog, and from the defendants’ allegation that the plaintiffs sustained nothing more than superficial scratches in the attack.
The plaintiffs’ complaint was filed in the Lowell District Court on January 22,1999 in two counts for negligence and strict liability under G.L.c. 140, §155.[3] The plaintiffs obtained a Mass. R. Civ. P., Rule 4.1(f), real estate attachment against Lipp’s properly.[4] *22 Defendant Lipp filed an answer pro se denying he was the dog’s owner or keeper and setting forth the following three counterclaims: (1) “Conspiracy to extort money,” for the plaintiffs’ allegedly false claim that he was the dog’s owner or keeper, (2) “Perjury,” for the plaintiffs’ allegedly false description of the dog as a “pit bull” and (3) “Libel,” for the plaintiffs’ alleged “canvassing” of the neighborhood with a petition about the dog. Defendant Nocco, also pro se, filed a late answer on February 25, 1998 which the defendants have not included in the appendix.[5]
What followed in the Lowell court after the defendants’ answers was a delay of more than two years resulting almost entirely from the defendants’ unyielding efforts at every stage of the proceedings to postpone or prevent the adjudication of the plaintiffs’ claim. The defendants began on April 20, 1999 by objecting to the plaintiffs’ interrogatories and requests for documents based on little more than their own peculiar and immaterial speculation that Patrick Brothers did not fully agree with his wife about the lawsuit. The defendants thus demanded that Patrick personally provide them with an individual affidavit or statement of his account of the case and with his documentary evidence of damages before they would furnish any discovery materials.[6] The defendants then refused to comply with a May 6,1999 court order compelling their production of documents. They responded to the plaintiffs’ subsequent Mass. R. Civ. P., Rule 33(a), request for a default judgment with a motion for dismissal of the case on the ground that the Lowell court was biased in favor of “municipal employees.”[7] Despite the plaintiffs’ numerous motions and the court’s order, the defendants did not begin to submit their discovery responses until August 18, 1999, and did not serve their first requests for discovery until the end of February, 2000.
The defendants next endeavored, unsuccessfully, to postpone both a February 28, 2000 case management conference and a May 3, 2000 pretrial conference, and to extend the discovery deadline. Their motions were denied, and a trial date was set for July 20, 2000. The defendants responded on June 21, 2000 by filing a motion for “judicial estoppel” and dismissal, improperly accusing both the plaintiffs and their counsel of fraud and deceit because they had made factual assertions in the pleadings with which the defendants simply disagreed.[8] The motion was denied. The defendants also filed the first of their motions for a “change of venue” based on both scurrilous charges of misconduct against various Lowell judges and court personnel and the outlandish *23 claim that they could not get a fair trial in any court in Middlesex County.[9] The motion was denied. The trial date was then rescheduled from July 20, 2000 to November 2, 2000.
Although two subsequent motions to continue the second trial date were denied, trial was rescheduled to April 4, 2001 after the defendants were unable to go forward on November 2,2000. On December 15,2000, the court entered a specific order that no further continuances would be allowed and that the trial would proceed on April 4th. Yet just two weeks before this third trial date, on March 21, 2001, the defendants moved again for a “change of venue.” That motion was denied on March 22, 2001. On March 28, 2001, the defendants attempted once more to prevent the April 4th trial by filing a motion “to appeal” and for a stay of proceedings. Spewing what had become their customary invective, the defendants demanded, inter alia, disbarment of the plaintiffs’ attorney; peijury, extortion and fraud charges against Nancy Brothers; and, again, a “change of venue” because the Lowell court was “being run by gangsters” who were conspiring with the plaintiffs in their “frame up.” On April 4, 2001, the Presiding Justice was finally able to accede to the defendants’ request by transferring the case to the Dedham District Court upon order of the Regional Administrative Justice. See G.L.c. 218, §43A and District Court Department Administrative Regulation No. 2-97.
Upon receipt of the case, the Dedham District Court promptly issued an order for a May 30, 2001 trial. Eight days before trial, on May 22, 2001, the defendants moved unsuccessfully for a continuance.[10] One day later, on May 23, 2001, they filed still another motion to extend the trial date.[11] Their request was denied.
Trial was finally commenced on May 30, 2001 in the Dedham District Court civil jury session. Despite the three prior trial date continuances over the preceding 2x/2 years, the defendants argued that they were still not prepared for trial. They also requested a second pretrial conference. The trial judge proceeded, however, to empanel a jury. Immediately prior to doing so, the judge told the parties to submit a list of potential witnesses who would be called during trial. The judge made it clear that the purpose of the witness list was to enable him to query prospective jurors about any acquaintance with a witness to insure juror impartiality, and that once an impartial jury was seated, no witness would be permitted to tes *24 tify who had not been identified on a witness list. Lipp stated that he would list the names of all defense witnesses even if they were not in the courtroom and would not be called. The judge cautioned that the jury might draw an adverse inference from any party's failure to call listed witnesses and that, in any event, the defendants would be unable during trial to refer to witnesses they were not going to call. Lipp remained adamant that the defendants would list all of their witnesses. The witness lists as submitted by the parties were ultimately read by the clerk without identifying the potential witness as plaintiffs’ or defendants’ to prevent unfavorable inferences by the jury.
Lipp next complained that the plaintiffs had referenced §159 as well as §155 of G.L.c. 140 in their complaint. After properly determining both that the plaintiffs had restricted their claim to §155 in their pretrial memorandum and that §159 was irrelevant because of the absence of any prior order against the dog, the judge ruled that the case would proceed solely under §155. Lipp continued to question the judge’s ruling, forcing the judge to explain, for the first of many times during trial, the effect of a court ruling or order.
THE COURT. Sir, let me make it clear to you how this is going to work, because I don’t want to have my having to say anything to you in front of the jury in any way which will affect what the jury thinks of you. Again, if I start to speak, sir, you’ll have to become quiet.
LIPP. Mmm-hmm.
THE COURT. And once I’ve issued a ruling that is the ruling. You can ask me to reconsider a ruling, but if I say I’ve heard it, that is it, move on, you’ll have to follow my order. We have an appeals court, this is all being transcribed, you’ll have the right to take me up if you don’t like any of my decisions. The Plaintiff will have the right to take me up, that’s why we have appeals courts, because judges sometimes make errors. We try not to, but sometimes we do, but the rules are what I’ve said they are.
During empaneling, the judge became aware that Lipp had counterclaims, including one for “perjury.” The judge informed Lipp at the sidebar that he could argue that the plaintiffs were lying, but that he could not pursue a private cause of action for perjury, and that the jury would not be instructed on that issue. Lipp protested the ruling, arguing that perjury was illegal. The judge repeated his ruling, but Lipp continued to interrupt and to argue. For the second time that morning, the judge warned Lipp very clearly that he had ruled, indicating that the defendants would have to accept that ruling for the purposes of trial.
During his opening statement, Lipp began to talk about the ex parte attachment on his property obtained by the plaintiffs at the commencement of suit. The judge called him to the sidebar and told him the attachment was not a matter for the jury and instructed him not to mention it. As soon as he resumed, however, Lipp immediately referred again to the attachment, necessitating another sidebar and another instruction.
A pattern of deliberate disregard of the judge’s rulings by both defendants in fact emerged as early as their opening statements. Despite the judge’s prior ruling about absent witnesses, Lipp attempted to inform the jury about affidavits from 13 witnesses who were not present at trial. The judge stopped him, noting that the matter was not something for the jury’s attention. Lipp replied, “All right,” but almost immediately began again to explain about his missing witnesses. The judge politely terminated his opening statement. Although Nocco had heard this exchange and the judge’s ruling, she proceeded in her own opening to attempt to describe the testimony of witnesses who were not present, remarlring “and that’s *25 why I wish my witnesses could be here, because they would state it.” Plaintiffs’ counsel objected, but Nocco continued her efforts to recite what people who were not going to be called at trial purportedly told her when she interviewed them. The judge ordered her to desist, but her refusal to limit herself to germane issues and to witnesses who would testify at trial necessitated another sidebar and, eventually, the termination of her opening statement.
The defendants also refused to abide by the judge’s continuing, repeated admonitions and instructions to confine their cross-examination of witnesses to questions and to refrain from making statements of alleged, unproven fact to argue with, contradict or bully the plaintiffs’ witnesses. Indeed, the judge was compelled on more than 30 separate occasions on the first day of trial to stop the defendants from testifying in rebuttal to the witnesses they were in the process of cross-examining. The defendants did not desist. While legal technicalities may elude a non-lawyer, the difference between a question and a statement of fact is plain enough.
The defendants, particularly Lipp, also continually argued with the judge about his evidentiary rulings. Lipp attempted repeatedly to question Nancy Brothers about whether she considered the dog attack an “accident.” Upon the plaintiffs’ objection, the judge excluded that line of questioning, but Lipp persisted. Similarly, despite the judge’s precise ruling at sidebar that Lipp was to refrain from any reference to his “peijury” counterclaim, Lipp asked Nancy Brothers, “You deny the defendants’ counterclaims, correct? You deny counterclaims of extortion, libel and the one I can’t talk about?” And again, when the judge excluded an immaterial newspaper article about the ineffectiveness of rabies shots that Lipp attempted to introduce, Lipp continued to contest the ruling after it was made.
Lipp became more confrontational when the plaintiffs called one Bettencourt as a witness. Bettencourt testified that he had been bitten by Pupling several years before while jogging past Lipp’s house. More significantly, he stated that Lipp had, in front of the dog officer, admitted that he was the owner of the dog, accepted responsibility for the dog, offered to pay and did in fact pay Bettencourt’s medical expenses from the attack. Maintaining that Bettencourt had been teasing Pupling and that he had paid Bettencourt’s medical bill only “out of the goodness of my heart, being a good neighbor,” Lipp began to ask Bettencourt a series of immaterial questions about the prior incident. The judge intervened, indicating that the first question was irrelevant. Lipp began to argue, and when the judge pointed out that he had ruled, Lipp responded, “No say from me.” He immediately asked Bettencourt another immaterial question about his medical insurance. The judge interjected again that the question was irrelevant. Lipp argued, “It’s relevant to me” and posed still another improper question as the judge attempted to reiterate his ruling. The judge called the parties to the sidebar, where Lipp continued to argue over the judge’s efforts to explain his ruling, repeating “NO” as the judge endeavored to speak. The judge was forced to have the jury taken out of the courtroom. He also took the additional step of arranging for a lawyer from the criminal session to come in and advise Lipp about his exposure for misconduct at trial. The trial judge then again, at length, explained his ruling and the defendants’ obligation to comply and to avoid continued disruptive behavior. He also informed Lipp of the possibility of a contempt order and warned the defendants that “ [i]f you don’t obey my rulings, then I have to do things which are not fair to you, in a sense you don’t get a fair hearing on the merits of your case.”
By the conclusion of the first day of trial, the plaintiffs had rested and defendant Nocco had completed her own direct testimony. On the morning of the second day of trial, Nocco announced that the defendants wanted to call one ‘Tommy Car-bone” as a witness. His name was not on the witness list the defendants had provided to the court and which was read to the jury. Consistent with his early ruling that witnesses not identified to the jury would not testify, the judge informed the *26 defendants that they could not call Carbone to the stand. Lipp protested and repeatedly interrupted as the judge attempted to explain his ruling. The following then ensued:
THE COURT. Sir, he may not testify. That’s my order.
LIPP. That’s your order.
THE COURT. Sir, if you do this again, I’m going to get counsel for you. I’ve told you again and again and again. Once I issue a ruling you are to obey it. You are not to continue arguing. It is particularly disruptive to the courtroom and it hurts your chances with the jury. That is my ruling. Do you understand, sir?
LIPP. No, I don’t.
At that point, as Lipp continued to interrupt and argue, the judge arranged for duty counsel from the criminal session to appear and advise defendant Lipp. When counsel appeared, the judge told him on the record and in front of the defendants that Lipp had repeatedly been argumentative and disruptive during the trial and that Lipp would not obey rulings with which he disagreed. The judge requested that counsel specifically explain the responsibilities of litigants in the courtroom and inform him that his continued misconduct could result in immediate sanctions for contempt.
However, at the conclusion of the recess, counsel informed the judge that he had been unable to advise Lipp because Lipp would not let him get a word in edgewise. The judge then instructed Lipp one more time of the necessity of complying with court orders and indicated that if Lipp engaged in further misconduct, “[t]he sanctions that I have available are to enter a judgment for the plaintiff, to hold you in contempt.” The judge repeated his ruling that witnesses not named on the witness lists would not be permitted to testify and that Lipp was required to refrain from making any reference to them before the jury. The following ensued:
THE COURT. Do you understand my ruling? Do you understand what I’ve ruled?
LIPP. I understand what you have ruled, Your Honor, without any opinion from myself or Defendant Nocco here, and without any knowledge of why Mr. Carbone is necessary in this, I mentioned extortion —
THE COURT. Sir —
LIPP. — counterclaims here.
THE COURT. Sir, listen to my rulings.
LIPP. And this is what it is all about.
THE COURT. Sir. Do you understand my ruling? Yes or no.
LIPP. No, I don’t.
THE COURT. Are you willing to obey my ruling?
LIPP. No, I’m not. I can’t go on without Mr. Carbone.
The court then engaged in the following colloquy with Nocco:
THE COURT. Okay. Ms. Nocco, do you understand my ruling? Yes or no, ma’am.
*27 NOCCO. Yes, I understand your ruling, sir.
THE COURT. Are you willing to obey my ruling?
NOCCO. I guess I’m not, because I’m not happy with it.
THE COURT. At this point I’m declaring that the defendants, by refusing to comply with my orders and acknowledging that they will refuse to obey my orders, have forfeited their right to further litigate this matter. I’m entering judgment for the plaintiffs, and I will now bring the jury in to address the question of damages.
But the judge afforded the defendants one last opportunity to proceed with trial, to “think through” what he had ordered, and to remember that upon any further disobedience, he would stop the trial, enter judgment for the plaintiffs, dismiss the jury and hold a hearing on damages. He asked again if the defendants understood. Lipp began lengthy remarks with the following: “You might as well just shut it down right now, I really don’t care, I’ll just go to the appeal [sic] court, because you’re not doing the right thing, you’re not being fair, and you’re not being honest.” At the conclusion of Lipp’s extended rant, with which Nocco indicated her agreement, the judge warned the defendants one last time that he would enter judgment for the plaintiffs if they defied his orders.
When the jury was brought back in, Lipp called his father to the stand to testify that he had given the dog to Nocco. Lipp asked the witness, “Who owns and cares for Pupling today?” Plaintiffs’ counsel objected, and the following ensued:
THE COURT. Sustained. No foundation.
WITNESS. Why the hell don’t we go home and forget about it.
THE COURT. Sir, sir.
WITNESS. Get out of here for Christ sakes.
LIPP. Your honor, I’m done with him.
WITNESS. I’m done with this —
THE COURT. Sir, you have to stay there.
WITNESS. Get the hell out of here. Want to put me in jail, go ahead.
LIPP. I think he wants to put us all in jail.
At that point, the court sent the jury out and told the defendants that their misconduct was intentionally and knowingly disruptive and that their inappropriate comments were deliberately made to inflame the jury. The judge announced that in consequence of the defendants’ willful misconduct, he would discharge the jury, enter a finding in favor of the plaintiffs, dismiss the counterclaims and assess damages himself based on the evidence in the record and on argument from both plaintiffs’ counsel and the defendants.[12] After argument, the judge made written findings in support of his assessment of damages in the amount of $4,000.00 for each plaintiff against both defendants, jointly and severally.
1. While the defendants present several arguments in their brief, many of them pertain to issues of fact not properly before an appellate court. Other contentions *28 are merely allegations of misconduct and corruption against the trial judge and employees of the Dedham District Court which are unsupported in the record and similar to those made by the defendants against the judges and employees of the Lowell District Court The only issue truly open to the defendants and dispositive of this appeal is whether the judge abused his discretion by ordering a judgment against them for their misconduct at trial.
2. It is a fundamental principle that “every judge must exercise his inherent powers as necessary to secure the full and effective administration of justice....” Commonwealth v. O’Neil, 418 Mass. 760, 765 (1994). This power includes the necessary authority “to deal with contumacious conduct in the courtroom in order to preserve the dignity, order and demeanor of the proceedings.” Sussman v. Commonwealth, 374 Mass. 692, 695 (1978). Unquestionably, a judge’s “inherent power” also entails “the authority to make the court’s lawful orders effective.” Beit v. Probate and Family Court Dept., 385 Mass. 854, 859 (1982). A codification of this inherent judicial authority can be found in Mass. R. Civ. P., Rule 41 (b)(2), which permits a trial court, in its discretion, to dismiss any action for a plaintiff’s failure to comply with procedural rules “or any order of the court.” See generally Reznik v. Friswell, 2003 Mass. App. Div. 42 and cases cited. In extreme circumstances involving continued or deliberate defiance of court orders, an offending party is not entitled to an escalating program of incremental sanctions before Rule 41 (b) (2) is invoked against him. When “a noncompliant litigant has manifested a disregard for orders of the court and been suitably forewarned of the consequences of continued intransigence, a trial judge need not exhaust milder sanctions before resorting to dismissal.” Friedman v. Globe Newspaper Co., 38 Mass. App. Ct. 923, 924 (1995).
A court’s necessary power to impose the ultimate sanction of an adverse judgment upon a disobedient party cannot be, and is not, restricted solely to plaintiffs. Rule 37(b) of the Mass. R. Civ. P., for example, authorizes a court in the exercise of its discretion to enter a default judgment for a defendant’s disobedience of a discovery order where the violation of the order is clear and where the defendant deliberately refused to comply despite adequate opportunities to do so. Roxse Homes Ltd. Partnership v. Roxse Homes, Inc., 399 Mass. 401, 406 (1987). See generally Bob Berman Assoc., Inc. v. Gross, 15 Mass. App. Ct. 1000 (1983). Similarly, a default judgment has been held a permissible sanction for a defendants willful or bad faith spoliation of critical evidence which redounds to the plaintiff’s ultimate prejudice. Keene v. Brigham & Women’s Hosp., Inc., 439 Mass. 223, 235-236 (2003). See also Nally v. Volkswagen of America, 405 Mass. 191 (1989). Operative in these and similar cases was the trial court’s necessary exercise of established judicial authority to order judgment against a party whose intentional misconduct obstructed or prevented a trial on the merits, the preferred mechanism for the administration of justice.
Such is the instant case. While we have detailed much more of the procedural history and trial proceedings than we would ordinarily prefer, we have by no means provided an exhaustive account of the defendants’ flagrant, antagonistic disrespect for the judicial system or their affirmative, consistent efforts to undermine its effective and efficient operation in this case. A review of the record in its entirety militates against any conclusion other than that reached by the trial judge that the defendants’ misconduct at trial was deliberate, defiant and designed to prevent the adjudication of the plaintiffs’ claim.[13] The trial judge acted with considerable patience and laudable restraint in reiterating and explaining his rulings, in extending repeated ppportunjties to the defendants to cure their contumacious conduct by complying with those orders, and by clearly warning them of the inevitable consequences of their refusal to do so. Ultimately, both defendants flatly and defiantly announced for the record that they would not obey orders of the court. That final declaration of intransigence, and the inflammatory remarks to the jury which followed, effectively precluded any continuation of the trial. Short of *29 rewarding the defendants for their own misconduct by ordering a new trial before a new jury, thereby assisting them in again postponing any resolution of the plaintiffs’ claim, the remaining alternative was to enter a judgment against them as a final sanction. Under the circumstances of this case, we find no abuse of discretion in the trial court’s ruling.
3. While we are loath to detail any more of the defendants’ dilatory actions throughout the protracted proceedings in this case, we are compelled by still another misrepresentation in the defendants’ brief to address postjudgment proceedings. The defendants suggest that they were afforded insufficient time to prepare and file their briefs and the appendix because the court did not respond to their efforts “to make the record conform to the truth.” The assertion is patently false.
Judgment was entered on August 2, 2001. The defendants failed to file a notice of appeal and filing fee within the ten day period prescribed by Dist./Mun. Cts. R. A. D. A., Rule 4(a), and, in fact, have never filed the timely designation of a Dist./Mun. Cts. R. A. D. A., Rule 8C, appeal mandated by Rule 8C(b). On August 30, 2001, the defendants filed a late notice of appeal, a motion for a stay and a motion for an extension of time for “docketing the appeal.” Their filing fee was not paid until September 4,2001. Despite these facts and the plaintiffs’ subsequent motions to dismiss, the defendants’ appeal was not dismissed. Instead, the defendants succeeded in delaying even the preliminary step of obtaining a transcript for a full 8 months after judgment, during which time the defendants requested and then ignored multiple time extensions from trial court judges. Although cassette audiotapes of the trial were made available to them as early as September 12, 2001, the defendants waited for more than six months, until March 22,2002, to even request that the clerk select a transcriber. After a third dismissal motion by the plaintiffs was denied, the clerk made the selection. On April 23, 2002, however, defendant Nocco rejected that selection and filed a request for the designation of a new transcriber.
A transcript was prepared and the defendants’ Rule 8C appeal was finally received in this Appellate Division on August 12,2002. A Rule 10 notice and briefing schedule were issued to the parties on August 15, 2002. The defendants delayed until September 16, 2002, the very day their brief and the appendix were due, to file a motion for an extension and another motion for correction of the “record.” On September 16, 2002, this Division ordered the trial court to determine if corrections were necessary and, if so, to make them. On September 18, 2002, the trial court granted the defendants four weeks to prepare and file their proposed corrections of the transcript.[14] On October 18,2002, the defendants filed another motion to correct the record, to which were attached six pages of detailed, specific proposed corrections, by page and line number, of what were pri- *30 manly “inaudibles” in the transcript. On March 5,2003, after a hearing and in open court, the trial judge allowed the defendants’ October 18, 2002 motion to correct the transcript
After a two month delay, this Division was finally apprised of the trial court’s ruling. On May 28, 2003, we issued a Decision & Order to both parties which, inter alia, ordered the defendants to file their brief and the appendix by June 30, 2003; i.e., within the 30 day period mandated by Dist/Mun. Cts. R. A. D. A., Rule 19(a). On June 13, 2003, however, the defendants filed another motion to correct the record and a motion for a stay, arguing that they “resent[edj” being required to file their brief within the prescribed time. By Decision & Order of June 19,2003, this Division denied the defendants’ motion to correct and instructed the defendants to include any relevant proposed docket corrections in their brief. We also denied the defendants’ motion for a stay and again ordered them to file their brief and the appendix by June 30,2003.
Despite the two prior orders of this Division, the defendants filed yet another request for an extension on June 25, 2003. They argued: (1) that the trial judge’s allowance of their motion to correct the transcript on March 5,2003, in open court and after hearing, did not constitute an order to correct the transcript; (2) that while they conceded that the order was made in their presence in court on March 5, 2003, they did not consider themselves “officially informed” of the ruling until this Division’s Decision Order of May 28, 2003; (3) that additional time was needed for the transcriber to completely retype the transcript to include their proposed modifications which had been allowed by the trial judge; and (4) that still additional time would be necessary after that for the defendants to “receive and review” the transcript with the corrections that they themselves had drafted, proposed and filed in the trial court nine months before. By Decision & Order of June 25, 2003, this Division denied the defendants’ extension motion, ruling that the existing transcript, with the six pages of corrections attached, could simply be photocopied for inclusion in the appendix. As to the defendants’ brief, we noted:
The defendants should have been aware as of the time they filed their late notice of appeal on August 30,2001 of their obligation to file a brief in this matter. This Division’s August 15, 2002 Rule 10 notice gave them actual notice of their duty to prepare and file a brief. They have had specific notice since May 28,2003 that their brief was due by June 30,2003.
The defendants were ordered for the third time to file their brief and the appendix by June 30, 2003. The defendants then sought not only relief from the Supreme Judicial Court, but also intervention by the Chief Justice for Administration and Management of the Trial Court. Their requests were denied. The defendants ultimately filed their brief on July 1,2003 and transcript copies on July 3,2003, almost two years after judgment.
Appeal dismissed.
So ordered.

 The strict liability count also referred to G.L.c. 140, §159, which provides for treble damages in the event of injury cased by a dog previously ordered restrained. No such order is claimed here.

 While Lipp has complained in other pleadings that there is no basis for the attachment, the Lowell docket does not reflect any motion to dissolve the attachment pursuant to Mass. R. Civ. P., Rule 4.1(g).

 Nocco was represented by legal counsel for a time, but both defendants have appeared pro se in all proceedings since at least February, 2001.

 They also claimed that the Tewksbury Police Department report of the dog attack was “bogus.”

 The defendants’ entirely irrelevant assertion was that Patrick Brothers was a Tewksbury firefighter and that Nancy Brothers was the daughter of a Tewksbury Selectman.

 For example, the defendants argued that because the incident, which they did not witness, was in their opinion a “simple dog fight,” the plaintiffs should be precluded from claiming that they had been “viciously attacked.” The defendants insisted, without proof, that Pupling had been “securely attached to a heavy duty 6 foot chain” at the time of the attack, and then characterized the plaintiffs’ negligence claim as fraud. The defendants reiterated their own designation of the dog as a “shepherd mix” as if that were sufficient to preclude the “pit bull type” description given by the plaintiffs and the town dog officer.

 Much of defendant lipp’s animus apparently arises from the court’s refusal to accept, without trial, his assertion that although the dog lives in his home, he is not the keeper of the dog. Even if there had been no evidence of ownership at trial, Lipp could still be liable as a keeper. One who is not the owner of a dog, but who is “harboring with an assumption of custody, management and control of the dog,” may be found by the trier of fact to be its keeper. Salisbury v. Ferioli, 49 Mass. App. Ct. 485, 487 (2000).

 The defendants alleged that the trial could not proceed because, inter alia, the Lowell court docket was incorrect, the Lowell court had refused to accept their arguments a year earlier at the pretrial conference that Lipp did not own the dog, and no attempt had been made by the court to shorten defendant Lipp’s own list of witnesses.
As to the defendants’ allegations about trial court dockets, it should be noted that by order of this Division, the defendants were instructed that any docket inaccuracy or omission pertinent to material issues in this case could be argued in their briefs. No such argument has been presented.

 The only new ground in the defendants’ second motion in two days was captioned, “The Absent Conspiritor [sic].” The defendants claimed to have observed the town dog officer at parties at the plaintiffs’ home which they deemed proof that the dog officer was a “very big player” in the plaintiffs’ “conspiracy” and should be compelled to appear at trial.

 See Silkey v. New England Tel. & Tel. Co., 9 Mass. App. Ct. 816, 817 (1980) (right to jury trial on assessment of damages following default judgment is “available only ‘when and as required by statute.’”)

 Nocco’s ultimate refusal to obey orders was as flagrant as Lipp’s. If her general misconduct during the trial was not as egregious or persistent as Lipp’s, so too is the sanction against her a lesser one as a practical matter. She has consistently conceded that she is an owner or a keeper of the dog and is thus strictly liable under G.L.c. 140, §155. Despite the trial judge’s best efforts to restrict her testimony and witness questioning to relevant issues, Nocco managed to make it clear to the jury that she receives government assistance, works for low wages, is uninsured and is thus essentially judgment-proof. It is Lipp’s property alone that was attached in this action.

 The trial court had previously denied various requests by the defendants to “correct” the Lowell and Dedham District Court dockets. As noted, the defendants have failed on this appeal to identify any alleged error or omission in a trial court docket, whether or not material in any way to relevant issues in this case.